Good morning, Mr. Richardson. Good morning, Your Honor. May it please the Court, George Richardson of Sullivan and Worcester on behalf of plaintiff appellant Tarpon Bay, Southridge, and Steve Hicks. In Connecticut, as elsewhere, the gravamen of unconscionability is surprise and oppression. The district court's decision must be reversed because defendant Zerez Holdings did not show either. And while Zerez spills a lot of ink in its brief in cataloging how the noted issue was outrageous, nowhere does Zerez say that it didn't read or understand those terms at the time that it signed the note. And without that, there can be no proper defense of unconscionability. And why didn't Zerez do that? Well, as we explained in our brief, before and after they signed the signing fee note that was at issue here, Zerez and its predecessor names had swapped millions of dollars, I'm sorry, millions of dollars of shares of its stock for its debts. And there's a couple of pages in our briefs that go through that. But a couple of examples, they swapped $6.5 million shares of stock for a $650 debt. And at another point, they swapped 10 million shares of their stock for a $1,000 debt. And there were many similar deals. As the court is aware, there are two elements to unconscionability. They've been nicknamed substantive unconscionability and procedural unconscionability. Substantive goes to the term itself in the contract or the agreement that the defendant or the party complaining about it is. And the procedural aspect of unconscionability has to do with how that term got into the agreement. Are both required? It's an interesting question, Judge Katzmann. It is our position that, yes, they are. And more recent appellate decisions in Connecticut say both are, starting with the Brody case of, I think, five or six years ago. But I don't think it's necessary for this court to decide that. And I've noted, obviously, I went and looked at our, shepherdized our cases before I showed up this morning. And there are still a couple district courts, federal district court cases, in Connecticut after that time who take the same position that the district court did here. That is that you don't have to show both. But Brody is a Supreme Court of Connecticut decision. It says you need both. And it's our position that you have to show both. With respect to substantive, the district court said the note was substantially unconscionable because, and he used this throughout his decision, because the court explained plaintiff was seeking to get $25 million for a $25,000 debt. And he said, on its face, that's unconscionable. Now, as you know, there were two decisions here. And in the later decision, the district court came back to that and acknowledged that it probably got that $25 million number wrong by an order of magnitude. But that isn't even the point. The district court's true error was looking at unconscionability not at the time that the contract was made, but rather at the time of enforcement. And that is contrary to Connecticut law. It's contrary to, I think, the law throughout the United States. Unconscionability is determined at the time of the bargain. And for a very good policy reason, courts don't want themselves, right? It's judge-made law. Courts don't want to be put in the position of having to police bargains. That it looked OK at the time, and then years later, it looked awful. So your argument is that if Xerez did not have these subsequent transactions, the company could have gone belly up. And your client would have been left with the $25,000. Or had they converted it, they could have converted it into shares that were worthless. Absolutely worthless. So they were taking a risk. And if the risk paid off, good for your client. Is that sort of your position? Sure. And everyone knew. I mean, I normally don't quote Shakespeare. But everybody wanted the stock to go up, right? It was. Did Shakespeare say that? He may have, but he did say the thing that it's an end devoutly to be wished. But everyone wanted the stock to go up. Well, but counsel, this wasn't sort of an investment gamble. The term sheet says the purpose of the payment, which then could be, for whatever reason, converted to stock, was to cover tarpon bays, legal fees, and other expenses in engaging in this effort. Sure. I can't imagine anybody expected the legal fees and expenses to approach $2.5 or $2.2 million. Absolutely not. So how does it become, instead, just a generic investment that you got lucky on, as opposed to an effort to cover your costs? But it's not a generic investment that we got lucky on. It was at our choice. We could take cash or shares. Unlike some other cases, the note here, they could have paid it off whenever they want. There were no prepayment penalties. I know this court's decision in KSL, and there's the Adar case out of the New York Court of Appeals on certified question to this court. In those cases, similar notes, but in those cases, the obligor, the debtor, was prevented from prepaying the note in cash. And that is an investment. This was an investment. It was just a risk. We can do shares, or you can pay us in cash. What those shares end up being worth, we'll take the risk that they're worth nothing. But the parties, I'm sorry. The parties say it's, quote, to cover its expenses, including legal fees. It doesn't say, thank you for engaging with us, Tarpon. We're giving you this option, which might turn out to be really valuable if this all works out. I can understand the Shakespearean incentive that everyone shares to make this work. Sure. But the agreement says that the agreement between the parties is a payment designed to cover Tarpon Bay's legal expenses, expenses including legal fees. Right. And we took the risk of taking shares instead of cash, as all those other debtors did, right? The $650 debtor, the $1,000 debtor, took the risk of, we'll take a ton of stock, and maybe it'll be worth something. Council, I thought you were going to quote Shakespeare. The fault lies not in our stars, but in ourselves. Well, we can move on from that. I just want to make clear your position at this point on the consideration. Sure. Consideration is simple, Judge Tasker. And again, the district court circled back to this in its second opinion when it said, yeah, there probably was a return promise, right? That neither party was entering into this thing that we argue. Actually, there's no disagreement. Both parties say it was a contract. The district court said it wasn't a contract. But in any event, there was partial performance, right? So the contract was no longer executory. That satisfies consideration. So there was ample consideration for the deal, because it was no longer executory.  Can I ask a question? Do you have a follow-up? Are there factual issues that still need to be resolved? Is there consideration? I do not believe so. Certainly, the district court's opinion says so. I don't believe so, because the parties agree it was a contract. Only the district court said it wasn't. And the parties agree, not in a matter of theory, but they both set forth the fact that there was partial performance. So performance began. We did go out and sign up debtors, and that was performance. So there's ample consideration at that point, because the contract was no longer executory. So I think this brings me to a question that I'm going to ask both sides, is do we have a jurisdictional problem in hearing some of this or all of this case at all? The district court, as I understand, did not enter judgment for your opponent on your claims. Denied summary judgment on your claims, but did not enter summary judgment for anybody on those claims. Do we have a final judgment? On plaintiff's affirmative claims. Yeah. Or am I getting things wrong? I thought when we looked at the judgment, the judge did not enter judgment. Because normally, denial of summary judgment is not an appealable order, right? Right. You have to have a grant of summary judgment. Now, maybe that is simply something that can be described as a clerical defect, and it's apparent from the record that the judge was finally disposing. Basically saying, not only who was not winning on summary judgment, or who was not losing on summary judgment, but also who was winning on summary judgment. It's my understanding that both parties are confident that the district court finally adjudicated all of the claims that everybody has raised. Is that an accurate summary? I believe that, yeah, certainly on behalf of plaintiffs, Mr. Shapiro can speak for himself. But it's certainly my understanding that a final judgment was entered. It was the district court's intention to issue a final judgment to dispose of the entire case. Okay, so in your view, there's been a final adjudication and there is, and I'm trying to get my heart rate down when you raise this jurisdictional issue, but yeah. Okay, that's good. And maybe, why don't we hear from opposing counsel? And if we could start there, Mr. Richards, and you've reserved three minutes of rebuttal. We'll hear from you again. But Mr. Shapiro, would you just start with that, and do you share the understanding of your opponent that there has been a final adjudication of all the claims that issue here? Yes, Your Honor. And do you know what I'm talking about, about the idea that the judge denied summary judgment the first time around? But at least in the judgment, it didn't appear to say it was granting summary judgment for you, which is the flip side of what it did. Do you know what I mean? That's correct, and at that point in time, we had not moved for summary judgment. At that point in time, when the original order was issued on the unconscionability of the note, I believe that was by the time when we filed summary judgment, there were cross motions for summary judgment at that point in time. Was your motion for summary judgment, though, I'm calling them number one and number two, the second one. Did that move only on the counterclaims, or did you move for summary judgment on Tarpon Bay's three affirmative claims as well? We moved on the counterclaims only at that point in time. So there has never been a motion for summary judgment by your client on Tarpon Bay's three affirmative claims? Not an affirmative one on their affirmative claims, correct, Your Honor. However, in our vote for summary judgment, we did seek a declaratory judgment on that issue, I believe. I'm double checking now myself. Count two of the counterclaims. Correct. And on that one, your partial motion for summary judgment on Tarpon Bay's motion for request for declaratory relief was granted. But I didn't see one from you on Tarpon Bay's affirmative. That's correct. I didn't get to introduce myself, but Jonathan Shapiro on behalf of Zara, so thank you to the bench. And I please, I hope I don't get any Shakespeare questions myself. It's never my strong suit. I do want to start with and focus on the unconscionability, because I do think that is the core issue here for this panel. And I think my esteemed counsel summarized it well. When you're looking at unconscionability, there are two prime issues, procedural and substantive. You can break those down again into, what are they designed to do? Procedural, prevent surprise, and substantive, prevent oppression. In this case, we have both. To the question earlier as to whether both are required, we would submit that under Connecticut law, at this point in time, both are not required. That substantive unconscionability- Why would the Supreme Court of Connecticut repeatedly say you generally or typically need both? I mean, I understand maybe there's an exception sometimes that you can imagine, but did they say that? I can't remember if the word is generally or typically. And you are correct, Your Honor. They do say generally. And if you look at Smith versus Mitsubishi, that was the case where some of that language derived from. And it looked at substantive alone. And in a footnote in that case, it talked about you couldn't have it on the flip side of only procedural unconscionability being grounced by itself. You can have substantive unconscionability. So why don't you just take them each in turn, procedurally. Both parties were represented by counsel, is that right? There was no counsel involved at the time the note was being negotiated for my client. No counsel on your side at the time of the note. What about the term sheet? No, no, no, Your Honor. No counsel was involved. Okay. And I want to take a step back, if I may, just to talk about- Well, and I have another question. Okay. Had your client previously been involved in other transactions involving the issuance of shares in exchange for retiring debt or clearing debt or whatever you want to call it? No, Your Honor. So what are these transactions that opposing counsel was referencing? I believe he was referencing the claim purchase agreements that were at issue, and I perhaps may be mistaken. I thought that there were some previous similar transactions, they may not have been identical on the part of your client, where they were issuing shares. And perhaps the best way to put it is there is no three, eight, ten transactions. No, I'm not asking if it's exactly the same. I guess what I'm asking is, what were those transactions that they were alleging are similar? And could you explain to me what they were and why they were, in your view, so dissimilar as to suggest that your client didn't know what they were getting into? because that's their suggestion. They're saying, look, Xerxes is a sophisticated business, right? It's in the business of basically these emerging companies or emerging industries. You're basically in the business of risky business. You're taking out debt, you're trying to hit it big. You keep shifting what companies, what business you're in. And that your sophisticated player, the client's a sophisticated player, they know what they're doing. And they're suggesting that there are these similar transactions. So maybe could you just talk about what those transactions were and why, in your view, they're not sufficiently similar, that they do not suggest sophistication on your client's part. And again, your honor, I think the difference in those transactions, if I'm recalling them correctly, is more in the framework of what the three, eight, ten transaction is designed to do. And the uniqueness of that proposal, which was unique, was something my client had never heard of before, was never involved with before, of how that debt is retired, how it goes through this fairness proceeding by starting another proceeding in court to retire that debt after it is all, in what the claim here was by the plaintiff, was to really bring all these debts together under one, file this lawsuit, and then get this fairness hearing, so it's separated out. That was the needy component. That is how it was different from anything else that they had ever done, and frankly, anything else they had ever heard of. Now, following up on Judge Nardini's question, you would agree that your client is a sophisticated business entity? I'm sorry, your honor? You would agree that your client is a sophisticated business entity? Sophisticated business entity? Yeah. I would agree that they are a pink sheet company. That level of sophistication as to this type of transaction, not necessarily, but as to a business entity, they're a commercial entity, your honor. And you entertain multiple third parties before choosing Tarpon Bay. I'm sorry, your honor? You entertain multiple parties. Before choosing Tarpon Bay for the debt to equity swap. Correct. So there was a decision making process involved there? Well, it was not so much a decision making process involved here. Yes, they'd received cold calls in the past from other people seeking them out and otherwise. But when this was presented, this unique opportunity as it was described to my client, there was nothing else on the table at that point in time that they were looking at to try to get out of their financial straits. I just want to be clear on something, and you've given us the answer, but I may not have understood it correctly. It's your, you're telling us that, and I'm not saying that this is dispositive or whatever, it's a factor perhaps, that Xerez was not represented by counsel? That's correct. When it executed the term sheet and the signing fee note? That's correct. So I thought there was a reference, and I'm looking at page 1770 in the appendix, but I'm not sure. I may be looking at the wrong thing. Indicating that you're, I thought that was the reference suggesting that your client was represented by a lawyer at the time, but maybe that's something different. And again, I may very well be looking at the wrong thing, and that's why I would welcome clarification. And if I may take a- Yeah, and I guess maybe the question is this. I understand your representation to say that your client was not represented with respect to signing the term sheet, or didn't have a lawyer review it. But at the time, did your client have a lawyer, and then just choose not to have the lawyer review it? because those are two different things, right? That's two different things, correct, Your Honor. And can you just tell me which were both, or neither of those is a true statement? The statement is, did they have a lawyer that was providing services in terms of regulatory and otherwise? Yes. Did they have a lawyer representing them in connection with this transaction? The answer is no. So I guess that goes to procedural reasonableness. If you have a lawyer who's representing you in your business, and you choose not to get your lawyer involved, it seems hard to call that procedural unconscionability. Because again, this is sort of suggesting there's some sort of surprise or some sort of bad conduct by the other actor. Whereas if the client has a lawyer that they're using for business purposes and chooses not to use it, it seems awfully hard to have that as a factor that counts against the conscionability of the contract, don't you think? Well, if I could, Your Honor, I actually do think the surprise is there, and it comes down to the heart of the court's decision in ruling that the contract was unconscionable. As you said, what's the element of surprise? Does anyone think that they're going to sign a promissory note under any circumstances? And this is kind of issue number one, front and central for this case, which is when you sign that note, you think you are getting something of value. And this was the exact issue with this note. There was nothing of value. Well, I guess there though, that's another way of saying there's no consideration, right? Whether there's something of value you're getting, right? And didn't Judge Underhill say that is a matter as to which factual disputes remain? He did not decide whether there's consideration. So I guess I don't see how we can have a conscionability determination turn on a lack of consideration where the judge has already said, wait a minute, wait a minute. There's a factual dispute here. Maybe there was not consideration, but there's been no finding of that. So how do we say that there was no consideration if the district court has said, well, that's not a question of law that I can resolve. Well, there's two points to that, your honor. So number one, in terms of the consideration issue. As to consideration, from our standpoint, there was no consideration. No, I understand that, but in terms of where we are right now as an appellate reviewing court. And so, but when you're looking at the issue of unconscionability, it is a fact-intensive inquiry. Judge Underhill made findings as to that. And when we're talking about the procedural aspect, and I'm just focusing on that. Again, this is why I say it goes to the heart of his decision. That $25,000, I'm going to put it a different way. You have a business. You're the owner of a business. Someone comes to you, because you're in finance, and say, I'll let you. I've got a proposition for you, help you with your business, sign this note for $25,000. You sign the note, and then they say, you have to pay me the $25,000 yet. You say, I didn't get the $25,000 yet, what are you talking about? You mean I didn't get the $25,000? You sign a note for $25,000. You're, you meaning Zara's? Yes. In this case- So why would Zara's be thinking they're getting $25,000, or are you saying I didn't get anything worth $25,000? That's exactly what we're saying, your honor. And that was, and I know council talked about the, what framework- But again, I thought one of the options on the table that's being argued is, well, let's say it's an implied contract, right? And it was $25,000 to be paid by your client, and the consideration was a promise to go out, round up this debt, which would then be retired. And it is perfectly permissible to have a contract where you pay someone X dollars in exchange for a promise of performance, right? I mean, there are plenty of contracts where you say, I'll only do it if you pay me up front, right? Correct, your honor. And because my understanding is it has not yet been adjudicated whether there was an implied contract, whether there was consideration. I guess I don't see how then we can decide now the conscionability on that ground. I understand there might be other grounds. You mean on the procedural grounds? Yeah, well, you could decide procedural unconscionability exists for various other reasons. But I don't see how we can base that finding on a lack of consideration or a lack of a contract where the district court has said there are factual disputes that prevent me from deciding whether there was a contract or there was consideration. That's my trouble. How do we rely on that when we know there are factual disputes the court has called us? Normally, those are not appealable decisions, right? Well, I think when it comes to the procedural aspect of it, in terms of those weren't the considerations for Judge Underhill when he made it. He was looking at the bargaining power, the lack of meaningful choice, the exploitation issues. All those things- Those I understand. Right. Those were the issues he was focused on in making that decision, from my reading of it, as to why he found procedural unconscionability in this case. The unequal bargaining power, the lack of meaningful choice, which gambling was not, there is no opposition to that. There's no issue at the lowest point of that. Well, let me ask you this, though. The whole idea that it wasn't just a few months later after they signed the term sheet, your client said, well, actually, we got funding from another place, so never mind. We actually think this is a bad deal. So I think this suggestion that you have a client who's absolutely desperate on the ropes, is thrown a lifeline to keep from drowning, has no chance but to grab it, isn't that undermined by the notion that they've been getting these calls from other venture capitalists, they don't like the deals, they're not interested, they don't seem attractive. They get this one, they grab it, and then a few months later, oh, actually, you know what, a better deal came down the line, much better, let's take that. Does that undermine the suggestion that your client was in such a position of desperation that basically only a delusional person would have agreed, which is one of the ways that the Connecticut Supreme Court has described unconscionability. I don't think so, Your Honor, because in this instance, there was no concrete deal ever proposed to them. Yes, they were getting cold calls, but in terms of the framework of those and what those deals were, nothing was in front of them at that point in time when this deal was presented to them. Okay, I think we have your argument. Do you have any? Yeah, please. Just to follow up on, your brother says that you have not pointed to a case in the last 20 years, which has held an agreement unconscionable, where the party is asserting that the defense was a business. Do you agree with that? I'm sorry, Your Honor? Has there been a case in the last 20 years which has held that an agreement was unconscionable, where the party is asserting that the defense was a business? Was a business? Yeah. I don't know the answer to that off the top of my head, whether there's been one in the last 20 years. I know they're in the discussion about it. They do talk about commercial transactions being subject to it. It's not limited to just consumer, personally. It certainly can apply to businesses as well, and I'm not aware of any case that has said otherwise at this point in time. Okay, thank you very much. Thank you. Mr. Richardson, you have reserved three minutes for rebuttal. Thank you, Your Honor. First- Can I ask you, I'm sorry, would you be able to respond to one of the points that your opponent raised, that there was no counsel involved in this transaction? I want to make sure that we understand the factual- That's where I was going to start, Judge Navidia. First of all, the appellee's counsel said there was no counsel involved. There's nothing in the record to that effect. Mark Chung did work for the company. He was an attorney, and he submitted two affidavits in this matter, and never said he did not. So the record, in your view, is silent as to whether there was a lawyer or not a lawyer involved? No, it's silent so far. But then when we get to Mr. Chung's bill that you pointed out, Your Honor, that's on A1770 of the record, during the time period that the signing fee note was negotiated and executed, he sent a bill to what was then known as Definitive Rest Mattress, since for legal services rendered, and among the things he says he does is reviewing contractual matters and promissory notes. And he bills them $30,000 for $350 an hour, which means he spent 80 hours of time, and including reviewing promissory notes. So that's the state of the record. Just remind me the date when the promissory note was executed in this case. I believe it was January of 16, Your Honor, I think January 24. So your submission is that it falls within the time range of this bill, and therefore one possible inference is that promissory notes referenced in the bill might include this one. That's right, especially in the absence of Mr. Chung denying, because we raise this a lot, a lot, and there's no denial by Mr. Chung that he did such a thing. Mr. Shapiro said, I think it was in answer to Judge Kassman's question about the sophistication of his client, and essentially he said that they're not sophisticated in 3A10 transactions, which of course, not at issue. They are sophisticated, though, in issuing promissory notes in exchange, or I'm sorry, for issuing shares, massive amounts of shares, in exchange for promissory notes. Where do we find that in the record? Could you just give us the citation so we can find that for ourselves? Sure, Your Honor. It begins on page 22 of appellant's opening brief. And it just has a host of the transactions, and I don't believe those are all. We just culled those out of their filings with the SEC, and there's 10 or 12 of them. That's great, that's fine. Yeah. With respect to one last thing, if I may, with respect to bargaining power, there is Connecticut authority that we talked about in our briefs, specifically the Krishnamurti case, which says that in order to assert the defense of unconscionability and say that they were coerced into signing the note because of their financial consideration, that case says, yeah, but only if the person offering you the note caused your financial condition. And you can think of it completely in the consumer context, where Mrs. O'Malley's got a leak in her roof, she's got to get it fixed. The contractor said, go to my friend Bob here, and he'll lend you the money. And he does some horrible, unconscionable note that Mrs. O'Malley signs, it's got a balloon payment in it, it blows up. He caused that financial distress, right, by doing what he did in the first instance. And that's it. There's no allegation in the record, because it's not true, that any of the plaintiffs had anything to do with putting Xerez into the financial condition that I saw. And as the district court said when it came back in its second opinion, actually their financial fortune got better after this note was signed. Could I just follow up for a moment, returning to the questions of my colleagues? And that is conceptualizing the unconscionability question on the one hand, and the consideration issue on the other. So, posit the hypothetical where consideration still remains a question to be determined, factual issues, can we nonetheless address unconscionability? I mean, it's a great, I don't mean to sound that way, it's a difficult question. When these guys, if you recall, they started out by suing us in California, and they did not raise unconscionability in that. The California complaint's in the record, I'm not talking out of school. There was no mention of unconscionability, but they did mention lack of consideration. It's a theoretical question in my mind, because there is no doubt in my mind that there was consideration here for the two reasons we spoke about before, and that is there was a return promise, and we commenced performance. Either of that under the restatement or Connecticut law or anything says that's good consideration. But looking at it hypothetically in a law school sense, I think it is a lack of consideration case, or a consider, I think we win that argument. I don't think it's an unconscionability case at all. It's, was there consideration? And I say there is in the record consideration. Okay, thank you both, very well argued. Thank you all very much. We will take the case under advisement. And with that, we will ask, actually let me just note one thing, pause for one moment. Yes, we also have a number of motions on the calendar for today, and let me also note for the record that those also are taken under advisement. With that, we will stand adjourned. What was that, a fair?